# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN DAVIS,

     Plaintiff,

     v.

JOHN WETZEL, et al.,

     Defendants.

CIVIL ACTION NO. 1:18-CV-00804

(MEHALCHICK, M.J.)

## MEMORANDUM

This case was initiated by *pro se* prisoner-Plaintiff Kevin Davis ("Davis"), by filing a complaint on October 27, 2017, pursuant to 42 U.S.C. § 1983. (Doc. 5). In his second amended complaint (the "Complaint"), Davis brings an Eighth Amendment deliberate indifference claim against the following Defendants: John E. Wetzel, Secretary of the Pennsylvania Department of Corrections ("DOC"); Paul A. Noel, M.D. ("Dr. Noel"), Chief of Clinical Services of the DOC's Bureau of Healthcare Services; John Steinhart, Assistant Medical Director of the Bureau of Health Care Services; Rich Wenhold, Coordinator of Infection Control for the Bureau of Healthcare Services; Correct Care Solutions, LLC, the contracted healthcare provider for the Department of Corrections; Dr. Jay Cowan, a Correct Care Solutions representative; Joseph Silva, Director of the DOC's Bureau of Health Care Services; Nedra Grego,[1] Corrections Healthcare Administrator at SCI-Fayette; N. Ranker, an infectious care nurse at SCI-Fayette; and John Doe, Chief Counsel for the Hepatitis C Treatment Committee. (Doc. 112, at 2-4). Davis alleges that all Defendants are members of

---

[1] Although this Defendant is currently known as Nedra Rice (Doc. 89, at 1), for the purposes of this memorandum the Court will continue to refer to her by her former last name: Grego.

the Hepatitis C Treatment Committee ("the Committee"), which has adopted a policy in violation of the Eighth Amendment and rejected his request for treatment for nonmonetary reasons in deliberate indifference to his serious medical need to be treated for Hepatitis C. (Doc. 112, at 2-5).

Pending before the Court is a motion for summary judgment filed by Defendants Dr. Jay Cowan ("Cowan") and Correct Care Solutions, LLC ("CCS") (collectively, the "Correct Care Defendants"). (Doc. 184). Correct Care Defendants aver that the record presents no evidence that they were deliberately indifferent to Davis's serious medical needs, including his Hepatitis C infection. (Doc. 188, at 3-4). Specifically, Correct Care Defendants argue that they were not deliberately indifferent to Davis's medical condition because his medical records reveal that his condition was continually monitored and treated when Davis was considered a candidate for treatment. (Doc. 188, at 4). Correct Care Defendants assert that Davis fails to present evidence to establish their personal involvement or evidence that suggests CCS maintains a policy, practices, or custom of deliberate indifference. (Doc. 188, at 17). Lastly, Correct Care Defendants argue that Davis has not properly exhausted his administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. (Doc. 188, at 20).

For the reasons stated herein, the Court will grant the motion for summary judgment. (Doc. 184).

I.   **SUMMARY OF MATERIAL FACTS**

This factual background is taken from Correct Care Defendants' statement of material facts and accompanying exhibits. (Doc. 184-2; Doc. 185). Pursuant to Local Rule 56.1, Davis has provided his response to Correct Care Defendants' statement of facts and has provided

accompanying exhibits. (Doc. 195-1; Doc. 196). Where Davis disputes facts and supports those disputes in the record, as required by Local Rule 56.1, those disputes are noted. Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition, the facts have been taken in the light most favorable to Davis as the non-moving party, with all reasonable inferences drawn in his favor.

A. PROCEDURAL HISTORY

Davis is an inmate currently incarcerated within the Pennsylvania DOC at the State Correctional Institute at Fayette ("SCI-Fayette"). (Doc. 184, at 1). On October 30, 2017, Davis filed a complaint initiating a civil rights action pursuant to 42 U.S.C. § 1983, alleging claims under the Eighth Amendment for deliberate indifference regarding his treatment for Hepatitis C. (Doc. 184, at 1).

On October 22, 2018, the undersigned United States Magistrate Judge issued a Memorandum and Order granting two motions to dismiss that had been filed by CCS (Doc. 25; Doc. 50), dismissing the original complaint without prejudice. (Doc. 85; Doc. 86). Specifically, the Court found that Davis failed to adequately plead how Defendants Wetzel, Ranker, and Grego were personally involved in the constitutional wrongdoings he alleged. (Doc. 85, at 5-10). The Court also found that Davis failed to demonstrate how CCS established a policy, custom, or practice that gave rise to the Eighth Amendment violations he complained of, as required for *Monell* liability under § 1983. (Doc. 85, at 10-13); *see Monell v. Dep't. of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978). The Court granted Davis leave to file an amended complaint and emphasized that Davis's amended pleading must aver facts that specify "how each individual Defendant contributed to the allegations giving rise to

the complaint." (Doc. 85, at 14). Davis filed the amended complaint on November 13, 2018. (Doc. 87).

On November 27, 2018, Defendants Grego, Noel, Ranker, Wetzel, and Silver ("DOC Defendants") filed a partial motion to dismiss the amended complaint, along with a brief in support thereof. (Doc. 89; Doc. 90). On the same day, CCS also filed a motion to dismiss and brief in support. (Doc. 91; Doc. 92). Davis filed a brief in opposition to DOC Defendants' motion on December 19, 2018, and a brief in opposition to CCS's motion on December 20, 2018. (Doc. 94; Doc. 96). The undersigned issued a Memorandum and Order on February 15, 2019, granting the motions to dismiss and granting Davis leave to file a second amended complaint. (Doc. 104; Doc. 105). This Court found that Davis failed to demonstrate how CCS established a policy, custom, or practice giving rise to *Monell* liability under § 1983 and that Davis failed to allege that Defendants Ranker and Grego acted with deliberate indifference. (Doc. 105).

On February 27, 2019, Davis filed the Complaint, challenging the constitutionality of the DOC's interim Hepatitis C policy. (Doc. 112). Davis alleges that Correct Care Defendants are members of the Hepatitis C Treatment Committee that is responsible for adopting the Hepatitis C policy. (Doc. 112, at 3-4, 11). Davis claims that the Hepatitis C policy prevents inmates without "vast fibrosis or cirrhosis or who do have fibrosis or cirrhosis" from receiving direct-acting antiviral drug ("DAAD") medications. (Doc. 112, at 5). Davis also asserts that the Hepatitis C policy is deliberately indifferent to the known risk that he, and other prisoners with Hepatitis C, will continue to suffer from complications including ascites, portal hypertension, hepatic encephalopathy, and esophageal varices. (Doc. 112, at 1, 5, 9). Davis challenges the application of the policy and the decision to deny him DAAD treatment despite

his serious illness. (Doc. 112, at 1, 9-12). Due to Defendants' refusal to treat Davis with the DAAD medications he requested, Davis alleges that he suffers from liver damage, abdominal pain, daily rectal bleeding, fainting spells, and a skin condition. (Doc. 112, at 10-11).

Davis also claims that Correct Care Defendants are responsible for "a policy, practice or custom of ignoring the serious medical needs of Pennsylvania prisoners to save funds." (Doc. 112, at 10-11). Davis claims that the consequence of their policies and customs is that patients, including himself, suffer declining health including liver damage, abdominal pain, rectal blood flow, passing out, and skin conditions. (Doc. 112, at 11). Further, Davis claims that Defendant Cowan, as the Correct Care Solutions representative, is personally liable for ensuring that the policy is followed. (Doc. 112, at 3).

As for relief, Davis seeks declaratory judgment that Defendants violated his "Eighth Amendment right to medical care for Hepatitis C." (Doc. 112, at 12). He also seeks to enjoin the use of the DOC's Hepatitis C policy, receive the curative DAAD medication he requested, and obtain immediate treatment for his Hepatitis C-related skin complications. (Doc. 112, at 12). Davis additionally seeks damages for the harm caused to his liver by effectively ignoring his request for Hepatitis C treatment and leaving his condition untreated. (Doc. 112, at 12).

On March 25, 2019, Correct Care Defendants filed a motion to dismiss the Complaint, arguing that Davis has not stated a cognizable claim under 42 U.S.C. § 1983. (Doc. 116). Specifically, Correct Care Defendants argue that the Complaint does not adequately plead the existence of a constitutionally injurious policy, practice, or custom that can be attributed to CCS. (Doc. 117, at 5). Correct Care Defendants further assert Davis alleges no personal involvement by Cowan and that the extent of his alleged involvement is limited to a supervisory role as liaison between the Committee and CCS. (Doc. 117, at 4-5). On February

25, 2020, the Court denied Correct Care Defendants' motion to dismiss, finding that, at the pleading stage, Davis adequately alleges the existence of an unconstitutional policy and facts that indicate CCS played an active role in the implementations of the policy. (Doc. 149, at 11-12; Doc. 150). Further, the Court found that Davis adequately alleged facts to state a claim against Cowan because he claims Cowan is a representative of CCS and a member of the Hepatitis C Treatment Committee. (Doc. 149, at 13).

On March 12, 2021, Correct Care Defendants filed the instant motion for summary judgment. (Doc. 184). The motion is fully briefed and ripe for disposition. (Doc. 185; Doc. 188; Doc. 195; Doc. 196; Doc. 197; Doc. 198; Doc. 200; Doc. 201).

B. DAVIS'S MEDICAL HISTORY

The events giving rise to Davis's cause of action stem from the DOC's Hepatitis C policy, and the decision to deny him certain treatment pursuant to this policy.[2] Davis was diagnosed with Hepatitis C while incarcerated within the DOC, and after being transferred to SCI-Smithfield, Davis suffered from related liver deterioration. (Doc. 112, at 5). As such, in November of 1998, Davis alleges that DOC physicians determined he met the criteria for Hepatitis C treatment and prescribed him Ribavirin and Interferon.[3] (Doc. 112, at 5-6, 15). Davis's condition did not respond to these antiviral medications, however, and the DOC

---

[2] The Court notes that Davis has submitted copies of certain records in support of his amended complaint. (Doc. 112, at 14-23). These records document the disposition of Grievance No. 664288, as well as other informal requests related to Davis's Hepatitis C. As Davis has incorporated these documents into the amended complaint by reference, the Court considers them in the instant memorandum. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (Finding that under Rule 12(b)(6) the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[3] Davis states that he was never treated in 1998, but that he was treated from 2003 to 2004 by Dr. Long at SCI-Smithfield. (Doc. 196, ¶ 6; Doc. 195-1, at 2).

eventually stopped this treatment in 2004. (Doc. 112, at 6, 15; Doc. 195-1, at 2). Thereafter, in February 2007, Davis was transferred to SCI-Fayette, where he claims his Hepatitis C worsened. (Doc. 112, at 6).

On September 17, 2015, Michael Herbik, D.O. ("Dr. Herbik"), examined Davis at the Hepatitis C clinic.[4] (Doc. 185, ¶ 6; Doc. 184-2, at 101). Dr. Herbik noted that treatment for Hepatitis C treatment has been previously provided in 1998, but that treatment failed. (Doc. 185, ¶ 12; Doc. 184-2, at 99, 120). Dr. Herbik planned for Davis to remain in the queue for treatment and placed an order for a Hepatitis C clinic follow-up to be scheduled for one year and for new lab work to be done in eleven months. (Doc. 185, ¶ 12; Doc. 184-2, at 99, 120).

From December 2016 to March 2017, Davis was evaluated by medical staff for complaints of a chest cold and bronchitis. (Doc. 185, ¶ 13, 17-21; Doc. 184-2, at 96, 96, 99, 110). On March 22, 2017, David Druskin, PA-C ("PA Druskin"), performed an annual physical exam of Davis and ordered new lab work, including a test for Hepatitis C viral load. (Doc. 185, ¶ 21; Doc. 184-2, at 96, 118). Davis had lab work performed on March 29, 2017, which was positive for Hepatitis C with a viral load of 5,310,274. (Doc. 185, ¶ 25; Doc. 184-2, at 14-16, 104-05). On April 19, 2017, PA Druskin reviewed the results of the lab work and noted that he planned to bring the viral load count to Dr. Noel's attention. (Doc. 185, ¶ 28; Doc. 184-2, at 97). On May 17, 2017, Davis had a follow-up visit with Alice Maksin, CRNP ("CRNP Maksin"), regarding his folliculitis and reported that his hair was growing back. (Doc. 185, ¶ 29; Doc. 184-2, at 94). CRNP Maksin noted that Davis's right jawline was hypopigmented with scabbing although his hair was growing back and advised Davis to

---

[4] Davis states that he was never treated by Dr. Herbik. (Doc. 196, ¶ 6).

continue the use of Cleocin gel and to follow up as needed. (Doc. 185, ¶ 29; Doc. 184-2, at 94). Medical staff continued to evaluate Davis regularly for his folliculitis and prescribe any medication as necessary over the next year. (Doc. 185, ¶ 34, 43, 44, 46, 56, 64, 69, 75, 77).

On September 27, 2017, Dr. Herbik evaluated Davis at the Hepatitis C clinic, planned for Davis to remain in the treatment queue, and again placed an order for a follow-up to be scheduled in one year and new lab work to be done in eleven months. (Doc. 185, ¶ 42; Doc. 184-2, at 9, 115). On June 19, 2018, Dr. Herbik evaluated Davis at the Hepatitis C clinic and placed an order for new lab work to be taken that month, including a blood panel, which was completed on June 21, 2018. (Doc. 185, ¶ 78-79; Doc. 184-2, at 30-32). On July 6, 2018, Dr. Herbik evaluated Davis at the Hepatitis C clinic for liver disease, noting that Davis had an APRI score of 0.525 but that the liver disease was well controlled and unchanged. (Doc. 185, ¶ 80; Doc. 184-2, at 278-84). On October 24, 2018, Davis was screened for Hepatitis C treatment and no exclusions to treatment were noted. (Doc. 185, ¶ 83; Doc. 184-2, at 270-74). It was noted that Davis was previously treated with Ribavirin and Pegasys in February 2004 and that he had an APRI level of 0.541 and MELD score of 8. (Doc. 185, ¶ 83; Doc. 184-2, at 270-74). On the same day, Dr. Paul Noel, chief of DOC Clinical Services, approved of fibrosure testing.[5] (Doc. 185, ¶ 84; Doc. 184-2, at 275).

On November 13, 2018, Dr. Noel conducted a final Hepatitis C evaluation, noting that Davis's fibrosis score was an F-4 and approving Davis for treatment with anti-viral

---

[5] Davis disagrees, stating that the Hepatitis C Treatment Committee needed to unanimously approve that testing. (Doc. 196, ¶ 84) (citing *Mumia v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *7-11 (M.D. Pa. Jan. 3, 2017)).

medication.[6] (Doc. 185, ¶ 86; Doc. 184-2, at 269). On November 29, 2018, Davis received an ultrasound of his liver, which revealed: hepatic parenchymal echotexture suggesting steatosis/hepatocellular disease; no focal hepatic mass; no portal venous hypertension; no ascites, splenomegaly or varices; and unremarkable biliary tree. (Doc. 185, ¶ 88; Doc. 184-2, at 312). On December 18, 2018, Davis had a tele-medic evaluation with the Temple University provider to discuss Hepatitis C treatment and planned to commence Zepatier for twelve weeks, from December 24, 2018, to March 17, 2019. (Doc. 185, ¶ 91; Doc. 184-2, at 253-61). An order was placed for lab work to be obtained in week four, in January 2019, and in week twelve, in March 2019. (Doc. 185, ¶ 91; Doc. 184-2, at 253-61).

On January 22, 2019, Davis performed lab work, which revealed that he was negative for Hepatitis C. (Doc. 185, ¶ 93; Doc. 184-2, at 138-39). On February 5, 2019, CRNP Donnelly evaluated Davis as a follow-up to his folliculitis and Hepatitis C, reporting that Hepatitis C treatment shall continue and chronic clinic for liver disease was to be discontinued as Davis was being treated for Hepatitis C. (Doc. 185, ¶ 95; Doc. 184-2, at 247-48). Dr. Herbik evaluated Davis on February 14, 2019, for a routine follow-up of his folliculitis, noting that Davis was to continue the use of Cleocin gel.[7] (Doc. 185, ¶ 96; Doc. 184-2, at 242-43. On March 19, 2019, Davis obtained lab work, which revealed he was negative for Hepatitis C. (Doc. 185, ¶ 97; Doc. 184-2, at 136-37).

On April 11, 2019, twelve weeks after post-initiation of treatment, Davis attended the Temple University treatment clinic for Hepatitis C. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39).

---

[6] Davis disagrees, stating that the Hepatitis C Treatment Committee needed to unanimously approve that testing. (Doc. 196, ¶ 86) (citing *Mumia v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *7-11 (M.D. Pa. Jan. 3, 2017)).

[7] *See supra* 4; (Doc. 196, ¶ 96).

Davis underwent treatment from December 24, 2018, to March 17, 2019. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39). It was noted that Davis reported few plaques on legs and face with some itchy patches, and Davis was recommended to use antifungal cream for likely tinea and to follow up with sick call. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39). On May 30, 2019, Davis obtained an ultrasound of his abdomen, which revealed: mildly heterogeneous fatty echogenic liver, lower range of normal size, similar to prior study; no focal hepatic lesions; no frank portal hypertension; no splenomegaly or ascites; and no cholelithiasis or biliary dilation. (Doc. 185, ¶ 100; Doc. 184-2, at 311). On June 18, 2019, Dr. Herbik met with Davis to discuss the results of the ultrasound and noted that it was stable.[8] (Doc. 185, ¶ 102; Doc. 184-2, at 228-29). On June 25, 2019, Davis obtained lab work, which revealed he was negative for Hepatitis C. (Doc. 185, ¶ 103; Doc. 184-2, at 134-35).

On July 1, 2019, CRNP Donnelly evaluated Davis for liver surveillance, ultrasound results, and sick call where Davis reported that he had a lesion on his face and lower right leg for ten years. (Doc. 185, ¶ 104; Doc. 184-2, at 226-227). CRNP Donnelly scheduled a dermatology appointment. (Doc. 185, ¶ 104; Doc. 184-2, at 226-27). On July 11, 2019, Davis was evaluated by the Temple University Clinic for Hepatitis C for a twenty-four post-initiation of treatment follow-up. (Doc. 185, ¶ 105; Doc. 184-2, at 218-25). The assessment provided that no Hepatitis C virus was detectable and scheduled a follow-up in fifty-two weeks. (Doc. 185, ¶ 105; Doc. 184-2, at 218-25). On July 23, 2019, Davis had a dermatology tele-medic visit to evaluate his facial dermatitis and right leg rash, and the dermatologist recommended daily application of Cleocin solution to facial areas and a biopsy of the leg lesion. (Doc. 185,

---

[8] *See supra* 4; (Doc. 196, ¶ 102).

¶ 106; Doc. 184-2, at 310). On July 26, 2019, CRNP Donnelly noted that the plan was to apply Cleocin solution daily to the facial areas, obtain a biopsy of the leg lesions, and administer 40 mg of Kenalog and topical Diprolene cream. (Doc. 185, ¶ 107; Doc. 184-2, at 216-17). Davis obtained a biopsy of his right ankle lesion on July 31, 2019. (Doc. 185, ¶ 108; Doc. 184-2, at 212-13). On September 9, 2019, PA Druskin evaluated Davis at the chronic care clinic for liver disease, noting that the estimated date Davis contracted liver disease was in 1995 and that his liver disease was well controlled and unchanged. (Doc. 185, ¶ 109; Doc. 184-2, at 203-11). On September 19, 2019, Darla Cowden, PA-C ("PA Cowden"), evaluated Davis for his complaint that the biopsy site was draining and tender. (Doc. 185, ¶ 110; Doc. 184-2, at 201-02).

In October 2019, Davis was treated for new-onset diabetes.[9] (Doc. 185, ¶ 112-18). On November 26, 2019, Davis obtained an ultrasound of his abdomen, which revealed a normal-sized liver and mild diffuse heterogeneous hyperechoic echotexture of the hepatic parenchyma without focal solid mass lesions. (Doc. 185, ¶ 123; Doc. 184-2, at 350). On February 27, 2020, PA Cowden evaluated Davis for chronic care clinic, addressing Davis's diabetes, hypertension, and liver disease, and noted that Davis was to return for liver chronic clinic in six months.[10] (Doc. 185, ¶ 125; Doc. 184-2, at 329-38). On March 13, 2020, PA Cowden reviewed Davis's medications and glucometers, noting that Davis was not showing

---

[9] Davis clarifies that before October 20, 2019, he did not suffer from an underlying diabetic condition and asserts that the onset of diabetes was triggered by the deprivation of treatment for his Hepatitis C viral infection. (Doc. 196, ¶ 112); *see supra* 4.

[10] Davis disagrees and asserts that PA Cowden discontinued his insulin after PA Cowden was notified that Davis filed Grievance Nos. 6642988 and 853387. (Doc. 196, ¶ 125).

up for evening sticks and that PA Cowden planned to reduce his Lantus to 16 units.[11] (Doc. 185, ¶ 126; Doc. 184-2, at 322-24). Davis obtained a liver ultrasound on May 27, 2020, which revealed: normal liver size without focal hepatic mass; no portal hypertension; no biliary ductal dilation or cholelithiasis; and no ascites, splenic varices, or splenomegaly. (Doc. 185, ¶ 128; Doc. 184-2, at 348). Davis performed lab work on June 30, 2020, which was negative for Hepatitis C. (Doc. 185, ¶ 129; Doc. 184-2, at 315-317). On October 15, 2020, Davis was evaluated by the chronic care clinic to address diabetes, dyslipidemia, and hypertension, where Norvasc was replaced with Atenolol for hypertension, and his diabetes was noted as being stable.[12] (Doc. 185, ¶ 130; Doc. 184-2, at 354-62).

## C. DAVIS'S GRIEVANCE FILLINGS

On March 13, 2014, Davis filed Grievance No. 501173, wherein he complained of an issue with a marriage license. (Doc. 185, ¶ 2; Doc. 184-3, at 1-9). On March 22, 2014, Davis filed Grievance No. 502631, wherein he complained that the mailroom instituted a policy change and did not notify inmates of this change. (Doc. 185, ¶ 3; Doc. 184-3, at 10-19). On July 2, 2014, Davis filed Grievance No. 516412, wherein he complained that the mailroom destroyed his personal property. (Doc. 185, ¶ 4; Doc. 184-3, at 20-31). On October 11, 2014, Davis filed Grievance No. 531519, wherein he complained that he was not being housed in a safe environment with access to safe water and food. (Doc. 185, ¶ 5; Doc. 184-3, at 32-38). On April 14, 2016, Davis filed Grievance No. 621833, wherein he complained that his television antenna was broken during a cell inspection. (Doc. 185, ¶ 11; Doc. 184-3, at 39-66).

---

[11] Davis disagrees and asserts that PA Cowden filed a false report, citing Grievance No. 863027. (Doc. 196, ¶ 126).

[12] Davis disagrees, citing Grievance No. 874022. (Doc. 196, ¶ 130).

On February 10, 2017, Davis filed Grievance No. 664288, wherein he complained that SCI-Fayette has a policy not to treat prisoners who have Hepatitis C. (Doc. 185, ¶ 14; Doc. 184-3, at 71). An Initial Review Response to the grievance, issued on February 10, 2017, denied the grievance because the Hepatitis C Treatment Committee found that Davis did not meet the required criteria to be approved for treatment. (Doc. 185, ¶ 15; Doc. 184-3, at 72). Davis appealed the initial denial of the grievance to the superintendent on March 12, 2017. (Doc. 185, ¶ 16; Doc. 184-3, at 73). On March 24, 2017, Joseph Trempus, Major of Unit Management, upheld the initial denial of the grievance.[13] (Doc. 185, ¶ 23; Doc. 184-3, at 74). Davis filed a final appeal of the grievance to the Secretary's Office of Inmate Grievances & Appeals ("SOIGA") on March 28, 2017. (Doc. 185, ¶ 24; Doc. 184-3, at 75-76). On April 13, 2017, SOIGA referred Grievance No. 664288 to the Bureau of Health Care Services.[14] (Doc. 185, ¶ 26; Doc. 184-3, at 70). On May 17, 2017, the Bureau of Health Care Services wrote to SOIGA regarding its review of the grievance, stating that the Bureau determined the medical care provided to Davis was reasonable and appropriate, that Davis was not a candidate for treatment, and that there is no evidence of neglect or deliberate indifference.[15] (Doc. 185, ¶ 30; Doc. 184-3, at 68). On May 31, 2017, SOIGA upheld the lower denials of the grievance. (Doc. 185, ¶ 31; Doc. 184-3, at 67).

---

[13] Davis disagrees and asserts that the initial denial of the grievance was issued by Joseph Tempus, Major of Unit Management. (Doc. 196, ¶ 23; Doc. 195-1, at 4).

[14] Davis disagrees and asserts that SOIGA referred the grievance to Richard Wenhold, Infection Control Coordinator, who at the time of referral was a member of the Hepatitis C Treatment Committee. (Doc. 196, ¶ 26; Doc. 195-1, at 5, 6).

[15] Davis clarified what the response by the Bureau of Health Care Services provided. (Doc. 196, ¶ 30; Doc. 195-1, at 8).

II.   **MOTION FOR SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the

nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'" *Velentzas v. U.S.*, No. 4: 07-CV-1255, 2010 WL 3896192, at *7 (M.D. Pa. Aug. 31, 2010) (quoting *Goode v. Nash*, 241 F. App'x 868, 868 (3d Cir. 2007)) (citation omitted); *see also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Velentzas*, 2010 WL 3896192, at *7 (quoting *Goode*, 241 F. App'x at 868). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007).

III.   **DISCUSSION**

In their motion for summary judgment, Correct Care Defendants argue that the record lacks evidence showing that Davis did not receive constitutionally appropriate medical care; that the record lacks evidence showing Correct Care Defendant's actions rose to the level of an Eighth Amendment violation; and that Davis failed to properly exhaust his administrative remedies pursuant to PLRA. (Doc. 188, at 2-3).

A.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

In moving for summary judgment, Correct Care Defendants assert that Davis did not exhaust the grievance process as it pertains to his claims against Correct Care Defendants,

that Davis did not seek monetary relief "as required by the DOC policy," and that Davis is thus precluded from seeking claims against Correct Care Defendants. (Doc. 188, at 20-26). Davis argues that the prison officials that handled Grievance No. 664288 waived their failure to exhaust defense by not rejecting the grievance for a procedural default and addressing the grievance on its merits. (Doc. 195, at 17). Further, Davis argues that the Grievance System Policy did not put him on notice that monetary relief was a required pleading in the grievance process. (Doc. 195, at 23).

In 1996, Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA"). 42 U.S.C. § 1997e. The PLRA mandates that prisoners exhaust all available administrative remedies prior to initiation of a suit under § 1983 for deprivation of Constitutional rights. 42 U.S.C. § 1997e(a). Previously discretionary, the PLRA made unexhausted claims unreviewable by the District Courts. *See Booth v. Churner*, 532 U.S. 731, 739 (2001). Although exhaustion is mandatory under the PLRA, proper exhaustion is an affirmative defense that must be pleaded and proven by the defendant. *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002); *see also Ray v. Kertes*, 285 F.3d 295 (3d Cir. 2002).

Courts may take judicial notice of the Pennsylvania DOC's 2017 Inmate Handbook (effective May 1, 2015) and policy statement, DC-ADM 804, captioned Inmate Grievance System ("IGS"), which sets forth the relevant procedures for inmates to file a grievance. (Doc. 195-1, at 19); *see Ali v. Superintendent SCI Camp Hill*, No. 1:14-CV-1851, 2015 WL 5913197, at *3 (M.D. Pa. Oct. 7, 2015) (internal citations omitted). The IGS requires a concern about prison life to be filed initially with the Facility Grievance Coordinator. DC-ADM 804 § 1(A)(5). Specific requirements of what the inmate must state in a grievance are identified in DC-ADM 804 § 1(A)(11), including a requirement that "if the inmate desires compensation

- 16 -

or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." DC-ADM 804 § 1(A)(11)(d). If the inmate receives an unfavorable response to his initial filing, he must appeal within fifteen working days to the Facility Manager. DC-ADM 804, § 2(A)(1)(a-b). If the inmate receives an unfavorable response from the Facility Manager's review, he must appeal within fifteen working days to the Final Review. DC-ADM 804, § 2(B)(1)(b). A proper appeal to Final Review must include a written appeal to the SOIGA. DC-ADM 804 § 2(B)(1)(j)(5).

Even where the relief sought is unavailable through administrative remedies, prisoners must pursue their claims through prison channels prior to initiation of litigation in federal courts. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006). Courts within the Third Circuit and the Middle District have consistently imposed a procedural default component on the exhaustion requirement that requires inmates to "fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court." *McClintic v. Bickell*, No. 1:14-CV-2005, 2015 WL 4207229, *3 (M.D. Pa. July 10, 2015) (citing *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)). "Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court." *McClintic*, 2015 WL 4207229, at *3 (citing *Spruill*, 372 F.3d 218). Indeed, an "untimely or otherwise procedurally defective administrative grievance" fails to satisfy the exhaustion requirement of the PLRA and the failure to properly "exhaust administrative remedies" is a bar to "filing suit in federal court." *See Woodford*, 548 U.S. at 83-84, 92.

The PLRA does not impose a name-all defendants requirement, and "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." *Jones v. Bock*, 549 U.S. 199, 217, 219 (2007); 42 U.S.C. § 1997(e). Rather, the

inmate is required to comply with the requirements of the prison's grievance system. *Jones*, 549 U.S. at 219. DC-ADM 804 provides that "[t]he inmate must include a statement of the facts relevant to the claim" in his grievance. DC-ADM 804(1)(A)(11). In *Spruill*, the inmate-plaintiff did not name a party against whom he later tried to bring a civil rights action. 372 F.3d at 234. The court found that an unexplained failure to identify a responsible prison official in a grievance may constitute a procedural default of the claim. *Spruill*, 372 F.3d at 234. Thus, in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies[.]" *Williams*, 146 F. App'x at 557.

The broad rule favoring full exhaustion admits of one, narrowly defined exception. "There is one exception to the mandatory exhaustion requirement: administrative remedies must be available to the prisoner." *Downey v. Pa. Dept. of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Ross v. Blake*, 578 U.S. 632, 641 (2016)); *see also Johnson v. Wireman*, 809 F. App'x 97, 100 (3d Cir. 2020) ("[A] prisoner need exhaust only available administrative remedies." (internal quotations omitted)). If an administrative remedy "operates as a simple dead end[,] ... is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation" it is considered unavailable. *Shifflett v. Korzniak*, 934 F.3d 356, 365 (3d. Cir. 2019) (internal quotations omitted); *see also Downey*, 968 F.3d at 305; *Ross*, 578 U.S. at 642. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000) (finding administrative remedies "unavailable" when correctional officers told the prisoner that his

grievances would not reach the Grievance Coordinator). However, an inmate's failure to exhaust will only be excused "under certain limited circumstances." *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005).

Correct Care Defendants seek dismissal of Davis's claims, arguing that, although Davis completed the grievance process in its entirety for Grievance No. 66428, Davis failed to "identify [Defendants] Dr. Cowan or CCS at any stage of the review process for Grievance No. 664288, the one grievance he pursued through final review regarding Hepatitis C." (Doc. 185, at 22). Additionally, Correct Care Defendants argue that Davis is "foreclosed from seeking monetary damages in this action because he did not include a request for such relief in his initial grievance as required by DOC Policy, DC-ADM 804." (Doc. 185, at 25).

Davis has pursued six grievances to the final stage of appeal in the Pennsylvania DOC grievance process, however, Grievance No. 664288 is the only one related to Davis's treatment for Hepatitis C. (Doc. 185, ¶ 14; Doc. 184-3, at 71). As discussed *supra*, Grievance No. 664288 stated:

> The SCI Fayette has a policy not to treat prisoners in their care, custody and control who have the Hepatitis C virus, notwithstanding a court ruling for the DOC to provide the latest antiviral medication that cures the illness before advanced liver damage.

> On February 6, 2017, in response to the undersigne[d] inquiry for treatment with HARVONI/medication that has been found to cure Hepatitis C, the undersign[ed] was advised that a committee in on at the SCI Fayette has not decided on treatment for the undersign[ed], notwithstanding the federal courts have ruled that treatment must be provided before advanced liver damage and the DOC must provide the latest antiviral medication that cures the illness.

(Doc. 185, ¶ 14; Doc. 184-3, at 71).

On February 10, 2017, the grievance was initially denied because "[t]here is a policy in place for the [DOC] regarding the treatment of inmates with Hepatitis C," and the Hepatitis C

Treatment Committee found that Davis did not meet the required criteria to be approved for treatment upon review of Davis's lab work and testing. (Doc. 185, ¶ 15; Doc. 184-3, at 72). Appealing the initial denial, Davis argued that he be treated "with the new drug that cures [Hepatitis C] before liver damage occurs," in accordance with Judge Mariani's ruling. (Doc. 184-3, at 73). On March 24, 2017, Joseph Trempus, Major of Unit Management, upheld the initial denial of the grievance. (Doc. 184-3, at 74).

Davis filed a final appeal of the grievance to the Secretary's Office of Inmate Grievances & Appeals ("SOIGA") on March 28, 2017. (Doc. 184-3, at 75-76). On April 13, 2017, SOIGA referred Grievance No. 664288 to the Bureau of Health Care Services. (Doc. 184-3, at 70). On May 17, 2017, the Bureau of Health Care Services wrote to SOIGA regarding its review of the grievance, stating that the Bureau determined that the medical care provided to Davis was reasonable and appropriate, that Davis was not a candidate for treatment, and that there is no evidence of neglect or deliberate indifference. (Doc. 185, ¶ 30; Doc. 184-3, at 68). The Final Appeal Decision was issued on May 31, 2017, and found as follows:

> Your issue with not being provided proper medical care for Hepatitis C was reviewed by the staff at the Bureau of Health Care Services. The BHCS reviewed the medical record and determined the medical care provided was reasonable and appropriate. The DOC has updated its protocol for treating Hepatitis C. You are not currently a candidate for treatment in accordance with the protocol and will continue to be monitored in chronic clinic as determined by your treatment plan. There is an orderly progression that is required before treatment with certain tests, etc. so, as you move ahead, you will be included in these tests as part of your work up prior to treatment. You are encouraged to participate in your treatment plan and to discuss your concerns or changes with a practitioner. There is no evidence of neglect or deliberate indifference has been found. Therefore, your requested relief is denied.

(Doc. 185, ¶ 31; Doc. 184-3, at 67).

It is undisputed that Davis's Grievance No. 664288 did not name Correct Care Defendants or request any kind of monetary relief. To refute the motion for summary judgment, Davis asserts that he was "precluded from naming [Correct Care Defendants] in Grievance No. 664288 by their names because the Hepatitis C policy only refers to the Defendant[s] as the Hepatitis C Treatment Committee." (Doc. 200, at 4). Davis relies on the case of *Abu-Jamal v. Kerestes*, No. 3:15-CV-00967, 2016 WL 4574646 (M.D. Pa. Aug. 31, 2016), where this Court found that, after receiving testimony from Dr. Noel and reviewing the Hepatitis C policy, it could not determine the named members of the Hepatitis C Treatment Committee. *Abu-Jamal*, 2016 WL 4574646, at *11. In that case, Dr. Noel testified that the Committee consists of at least four people: himself, as "the Chief of Clinical Services, the representative from the medical contractor, CCS, Infectious Control nurse, the Assistant Medical Director for the DOC, and anyone we have might invite to participate in any difficult cases." *Abu-Jamal*, 2016 WL 4574646, at *11.

Considering the prior testimony of Dr. Noel in the *Abu-Jamal* decision and given the circumstances of this case, the Court concludes that failure to name Correct Care Defendants does not amount to a procedural default barring Davis's claims. *See Abu*-Jamal, 2016 WL 4574646, at *11. Although Davis's Grievance No. 664288 may have been procedurally defaulted, the prison excused this default by investigating the grievance on the merits at the highest level. (Doc. 184-3, at 67). The prison was alerted to the problems Davis was alleging and, therefore, the prison had the opportunity to remedy this problem. Thus, Davis has properly exhausted his administrative remedies.

In sum, the Court finds that Davis has properly exhausted his administrative remedies.

(Doc. 184).[16]

B. EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS

In support of their motion for summary judgment, Correct Care Defendants argue that

Davis's claims that they were deliberately indifferent to his serious medical needs are

---

[16] Davis's claim for monetary damages remains before the Court, and with that claim, the question of whether Davis had to grieve the monetary damages he is currently seeking prior to filing this federal lawsuit. Citing the Third Circuit decision in *Spruill*, Davis contends that he was not provided notice that monetary relief was a requirement in initial grievances because there is no section in the Inmate Handbook regarding monetary relief for grievances. (Doc. 195, at 23); *see* 327 F.3d at 233-34. The Court finds that Davis's reliance on *Spruill* is misplaced. The version of DC-ADM 804 in effect when Davis filed his initial grievance specifically stated: "If the inmate desires compensation or other legal relief normally available from a court, *the inmate must request the specific relief sought in his/her initial grievance.*" DC-ADM 804 § 1(A)(11)(d) (emphasis added). When the Third Circuit decided *Spruill*, the court rejected a procedural default claim based on an inmate's failure to specifically request monetary relief because "the grievance policy in effect at that time permitted—but did not require—an inmate to identify the relief sought (including monetary relief) in his grievance." *Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018). "Subsequently, the Prison amended its policy to include the mandatory language deemed lacking in *Spruill*," using essentially identical language to what was suggested in the opinion. *Wright*, 729 F. App'x at 227. The Third Circuit in *Wright* upheld the district court's determination that "[the plaintiff] procedurally defaulted his claim for money damages by failing to request such relief in his grievance" because the "requirement is now mandatory." *Wright*, 729 F. App'x at 227. Therefore, the grievance policy clearly requires that Davis requested compensation when he filed the initial grievance. *See* DC-ADM 804 § 1(A)(11). Since, "[i]t is the prison's requirements, and not the PLRA, that defines the boundaries of proper exhaustion," a prisoner who fails to request monetary damages in the grievance process is barred from bringing a claim for monetary relief in federal court. Davis has not proffered or argued that his situation was urgent or emergent or that he was otherwise unable to exhaust the grievance process. *Smith v. Sec'y of Pa. Dep't of Corr.*, No. 18-1240, 2018 WL 4771778, at *1 (3d Cir. 2018) (citing *Jones*, 549 U.S. at 218 ); *see Krushin v. SCI Waymart*, No. 4:17-CV-1545, 2019 WL 1141691, at *3-4 (M.D. Pa. Jan. 29, 2019); *Wright*, 729 F. App'x at 227. It is undisputed that Davis failed to request monetary relief in Grievance No. 664288. (Doc. 184-3, at 71). As such, Davis's requests for monetary damages against Correct Care Defendants are barred. See *Wright*, 729 Fed. App'x at 227; *Krushin*, 2019 WL 1141691, at *3; *Sanders v. Beard*, No. 3:09-CV-1384, 2013 WL 2650215, at *4 (M.D. Pa. June 13, 2013); cf. *Downey v. Pennsylvania Department of Corrections*, 968 F.3d 299, 307 (3d Cir. 2020) (inmate not required to exhaust administrative remedies prior to requesting monetary relief in an urgent or emergency situation).

unsupported by the record evidence. (Doc. 188, at 4). Correct Care Defendants assert that contrary to Davis's allegations, the record evidence demonstrates that Davis received regular and appropriate medical treatment for Hepatitis C and was successfully treated and cured. (Doc. 188, at 16). Additionally, Correct Care Defendants assert that the record is devoid of evidence that Cowan was personally involved in the decision (nor was he personally involved with care) as to whether to approve Davis for DAAD treatment.[17] (Doc. 188, at 16). Davis responds that Correct Care Defendants, as members of the Hepatitis C Treatment Committee, deliberately denied providing treatment to Davis without justification and with the knowledge that delay of treatment would worsen Davis's medical condition. (Doc. 195, at 9-10).

To establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing

---

[17] It is well-settled that "a defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981) ). A defendant cannot be held liable in a § 1983 action on the theory of *respondeat superior. Rode*, 845 F.2d at 1207; *Flowers v. Phelps*, 514 F. App'x 100, 102 (3d Cir. 2013). Instead, a plaintiff must allege that the defendant either directed or had actual knowledge of and acquiesced in the alleged conduct. *See Atkinson v. Taylor*, 316 F.3d 257, 270 (3d Cir. 2003) (citing *Rode*, 845 F.2d at 1207). A court may infer that the defendant had contemporaneous knowledge from the surrounding circumstances; however, "the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995)). Fairly construed, Davis's Complaint alleges that Cowan, as a member of the Hepatitis C Treatment Committee, deliberately chose to deny treatment, or acquiesce to such denial, even though the Committee knew of the dangers that could come from delaying treatment for Hepatitis C. (Doc. 112, at 11). The Court agrees that a review of the summary judgment pleadings and all other documents in the records presents a lack of any evidence suggesting Cowan's involvement with Davis. However, Davis alleges that Cowan is part of the Hepatitis C Treatment Committee, which makes the ultimate decision to approve or deny treatment for inmates. (Doc. 112, at 11). Therefore, at this stage, Davis has successfully alleged the involvement of Cowan with respect to his Eighth Amendment claims.

*Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). Therefore, Davis must establish that Correct Care defendants acted with deliberate indifference to the treatment of his Hepatitis C. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). When the Court views the facts in the light most favorable to him, Davis does not meet this burden.

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, or "persistent conduct in the face of resultant pain and risk of permanent injury." *Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir. 1993); *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

The deliberate indifference prong of an adequacy of care claim, in particular, contains both an objective component, the "adequacy of the medical care[,]" and a subjective component, the "individual defendant's state of mind." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017). "[A] plaintiff must set forth evidence of an objectively serious medical need. A medical need qualifies as serious ... if ... it is one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Young v. Kazmerski*, 266 F. App'x 191, 193 (3d Cir. 2008)

(citing *Lanzaro*, 834 F.2d at 346-47) (quotations omitted). Here, there is no real dispute by the parties as to the seriousness of Davis's medical needs. Rather, the issue is whether or not Correct Care Defendants were deliberately indifferent to that need.

Where, as here, "a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017); *accord United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). "When medical care is provided, [courts] presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535 (emphasis added); *accord Brown v. Borough of Chambersburg*, 903 F.2d 274. 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *Lanzaro*, 834 F.2d at 346 ("[M]ere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation."); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("[T]he propriety or adequacy of a particular course of treatment ... remains a question of sound professional judgment."). Neither a prisoner's personal, subjective dissatisfaction with the care he has been provided, nor his disagreement with the professional judgment of trained medical staff, in and of itself, is sufficient to establish deliberate indifference. See *Hairston v. Director Bureau of Prisons*, 563 F. App'x. 893. 895 (3d Cir. 2014); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990): *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

There are, however, "circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. For example, prison officials "cannot deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Palakovic*, 854 F.3d at 228 (citations and internal quotations omitted). Likewise, "knowledge of the need for medical care may not be accompanied by the intentional refusal to provide that care." *Palakovic*, 854 F.3d at 228. The court should also consider the effect of denying medical treatment under any particular circumstances, including where such denial or delay results in unnecessary and wanton infliction of pain, or causes an inmate to suffer a life-long handicap or permanent loss, or render a condition irreparable. *Banks v. Beard*, No. 2:03-CV-659, 2006 WL 2192015, at *13 (W.D. Pa. Aug. 1, 2006). Outside of such situations, each claim must be evaluated to determine whether the treatment or lack thereof implicates the "broad and idealistic concepts of dignity, civilized standards, humanity and decency" that provide the underpinnings for defining the reaches of the Eighth Amendment. *Banks*, 2006 WL 2192015, at *13 (quoting *Estelle*, 429 U.S. at 102).

According to the Complaint, Davis was diagnosed with the Hepatitis C virus in November 1998, by a physician at SCI-Pittsburgh. (Doc. 112, at 5). After, Davis was transferred to SCI-Smithfield, where it was determined that his liver deteriorated and he met the criteria for Hepatitis C treatment. (Doc. 112, at 5). Davis was prescribed anti-viral medication by a DOC physician, which did not improve his condition, and treatment was discontinued. (Doc. 112, at 5-6, 15). In February 2007, Davis was transferred to SCI-Fayette, where his condition worsened and Davis developed a skin condition. (Doc. 112, at 6). On January 31, 2017, Davis filed a request for treatment of Hepatitis C to the Hepatitis C

Treatment Committee. (Doc. 112, at 6, 17). The Hepatitis C Treatment Committee rejected Davis's request and continued to monitor his medical needs. (Doc. 112, at 7). After his medical conditions worsened, Davis filed Grievance No. 664288 on February 10, 2017. (Doc. 112, at 7). Davis initiated the instant action on October 30, 2017. (Doc. 5). Davis asserts that Correct Care Defendants, as members of the Hepatitis C Treatment Committee that approve and deny treatment to inmates, acted with deliberate indifference to Davis's serious medical need by rejecting his request for treatment or, alternatively, acquiescing with the denial of treatment when his input was sought. (Doc. 112, at 11).

Davis first avers that Correct Care Defendants, as members of the Hepatitis C Treatment Committee, acted with deliberate indifference to Davis's serious medical need by rejecting his request for treatment or, alternatively, acquiescing with the denial of treatment when his input was sought. (Doc. 195, at 9-10). Correct Care Defendants submit that they are entitled to summary judgment because Davis "has received regular and appropriate medical treatment for his Hepatitis C while an inmate of the DOC, and he has even been successfully treated for his Hepatitis C and is now cured." (Doc. 188, at 16). As discussed, "[a]ll that is needed" to establish a delay of care claim is evidence that the delay "was motivated by non-medical factors." *Pearson*, 850 F.3d at 537. The summary judgment record belies this claim.

Davis submits that Correct Care Defendants' reason to deny treatment was "due to the cost for treatment and not for any medical reason." (Doc. 112, at 10). Further, Davis asserts that "[a]s a result of this cost-saving policy, [Davis] is forced to endure the effects of a damage[d] liver, daily blood flow from his [rectum], spells of passing out, a skin condition on face and legs and pain that serves no penological purpose while his health continues to decline." (Doc. 112, at 11). The denial of medical care, when based on non-medical factors

such as cost, may violate the Eighth Amendment. *See Lanzaro*, 834 F.2d at 346. However, "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Winslow v. Prison Health Serv.*, 406 F. App'x 671, 674 (3d Cir. 2011) (citing *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997)). The Third Circuit in *Winslow* upheld summary judgment for defendants responsible for providing prisoner-plaintiff's medical care despite "some record evidence suggesting that Defendants considered the cost of [plaintiff's] treatment" because "the record is equally clear that [defendants] did not focus exclusively or even predominantly on cost and that the treatment that they ordered was consistent with their professional judgment." 406 F. App'x at 675. Here, the record contains some evidence that Correct Care Defendants, as members of the Hepatitis C Treatment Committee, considered cost in deciding whether to provide Davis with Hepatitis C treatment. (Doc. 195-1, at 10). The declaration of Dr. Noel from January 10, 2018, states that "cost is one of several consideration[s] in the overall number of inmates that can be treated with DAADs in a given fiscal year." (Doc. 195-1, at 10).

According to Davis's medical records that Correct Care Defendants attached to the motion for summary judgment, from December 2016 to March 2017, Davis was evaluated by medical staff for complaints of a chest cold and bronchitis. (Doc. 185, ¶ 13, 17-21; Doc. 184-2, at 96, 96, 99, 110). In March 2017, PA Druskin performed an annual physical exam of Davis, and lab work revealed that Davis was positive for Hepatitis C with a viral load of 5,310,274. (Doc. 185, ¶ 21, 25; Doc. 184-2, at 14-16, 104-05). Medical staff continued to evaluate Davis regularly for his folliculitis and prescribe any medication as necessary over the next year. (Doc. 185, ¶ 34, 43, 44, 46, 56, 64, 69, 75, 77). On October 24, 2018, Davis was

screened for Hepatitis C treatment and no exclusions to treatment were noted. (Doc. 185, ¶ 83; Doc. 184-2, at 270-74). On the same day, Davis was approved to begin fibrosure testing. (Doc. 185, ¶ 84; Doc. 184-2, at 275). Contrary to Davis's allegations, on November 13, 2018, Dr. Noel conducted a final Hepatitis C evaluation and approved him for treatment with DAADs medication. (Doc. 185, ¶ 86; Doc. 184-2, at 269; Doc. 196, ¶ 86).

It is also undisputed from the record that Davis underwent Hepatitis C treatment from Temple University from December 24, 2018, to March 17, 2019. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39). Moreover, it is undisputed that Davis performed lab work on January 22, 2019, March 19, 2019, June 25, 2019, and June 30, 2020, all of which revealed that he was negative for Hepatitis C. (Doc. 185, ¶ 93, 97, 103, 129; Doc. 184-2, at 134-39, 315-317). Davis reported plaques on his legs and face with some itchy patches, so medical personnel recommended that he use antifungal cream for likely tinea and follow up with sick call. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39). After Davis reported that he had a lesion on his face and lower right leg for ten years, medical personnel scheduled a dermatology appointment. (Doc. 185, ¶ 104; Doc. 184-2, at 226-27). The dermatologist recommended daily application of Cleocin solution to facial areas and a biopsy of the leg lesion, which Davis obtained on July 31, 2019. (Doc. 185, ¶ 106, 108; Doc. 184-2, at 212-13, 310).

Additionally, record evidence states that the estimated date Davis contracted liver disease was in 1995 and that his liver disease was well controlled and unchanged. (Doc. 185, ¶ 109; Doc. 184-2, at 203-11). Medical personnel evaluated Davis for liver surveillance and ultrasound results of his abdomen, which revealed: mildly heterogeneous fatty echogenic liver, lower range of normal size, similar to prior study; no focal hepatic lesions; no frank portal hypertension; no splenomegaly or ascites; and no cholelithiasis or biliary dilation.

(Doc. 185, ¶ 100, 104; Doc. 184-2, at 226-27, 311). Davis obtained a liver ultrasound on May 27, 2020, which revealed: normal liver size without focal hepatic mass; no portal hypertension; no biliary ductal dilation or cholelithiasis; and no ascites, splenic varices, or splenomegaly. (Doc. 185, ¶ 128; Doc. 184-2, at 348). Lastly, the record suggests that medical personnel have continuously monitored Davis's diabetes, hypertension, and liver disease. (Doc. 185, ¶ 112-18, 25; Doc. 184-2, at 329-38).

As the foregoing makes clear, Davis was continuously monitored for his serious medical needs and treated with the appropriate medical attention. No reasonable jury could find that any delay was attributable to Correct Care Defendants, let alone that it was motivated by non-medical factors. *McCloskey v. Welch*, 803 F. App'x 578, at 582 (3d Cir. 2020). The record does not support Davis's claim that Correct Care Defendants, as alleged members of the Hepatitis C Treatment Committee, provided inadequate medical care in failing to provide Davis with DAADs medication or Hepatitis C treatment. *See Pearson*, 850 F.3d at 536 (noting that to create a triable issue of fact on an inadequate medical care claim, a prisoner must provide extrinsic proof that the medical treatment violated a professional standard of care). There is no circumstantial or extrinsic evidence that every "minimally competent professional" would have provided Davis with the requested DAAD treatment or approved Hepatitis C treatment at an earlier time. *Mitchell v. Gershen*, 466 F. App'x 84, 87 (3d Cir. 2011) ("[I]n order to sustain his deliberate indifference claim based on his objection to the type of diagnosis and treatment he received, [plaintiff] needs ... expert testimony because the ability to diagnose a foot infection and determine the proper treatment and medication protocol is not readily apparent to lay persons."). "[M]ere disagreement as to the proper medical treatment" is insufficient to demonstrate an adequacy of care claim. *Lanzaro*, 834 F.2d at 346;

*see Durmer*, 991 F.2d at 67 (explaining that deliberate indifference requires something "more than negligence").

      Notably, Davis does not point to record evidence to dispute the fact that he was treated by the Temple University clinic for Hepatitis C treatment, that Davis's lab work reveals no detection of Hepatitis C, and that he received medical attention for his other serious medical needs, including diabetes and liver disease. (Doc. 196). Rather, Davis submits that Correct Care Defendants "have deliberately denied providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead." (Doc. 195, at 10). Davis's allegation that Correct Care Defendants considered cost in deciding to deny him Hepatitis C treatment, coupled with record evidence which shows the decision was consistent with professional judgment, is insufficient to create a disputed material fact on the subjective prong of this deliberate indifference claim. *See Winslow*, 406 F. App'x at 672, 675; *see also Fantone v. Herbik*, 528 F. App'x 123, 125-26; 126 n. 3 (3d Cir. 2013) (evidence which shows defendants reviewed MRI's and x-rays of prisoner-plaintiff's ailment, but did not refer him for elective surgery, does "not demonstrate ... the [defendants] had a sufficient[ly] "culpable state of mind"). The undisputed record indicates Davis received regular medical attention for his Hepatitis C and was successfully treated from December 24, 2018, to March 17, 2019. (Doc. 185, ¶ 98; Doc. 184-2, at 234-39). "Averments that are 'entirely unsupported by the record and directly contrary to ... testimony,' or that are 'offered solely to defeat summary judgment,' may be disregarded." *Jugan v. Econ. Premier Assurance Co.*, 728 F. App'x 86, 91 (3d Cir. 2018) (quoting *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017)).

      Davis has not provided any extrinsic evidence to show the course of treatment was improper, and the course of treatment for Hepatitis C would not be obvious to a lay person.

*See Jackson v. Ivens*, 565 F. App'x 115, 118 (3d Cir. 2014). Moreover, where medical care is provided, the Court presumes the care to be adequate. *See Pearson*, 850 F. 3d at 535 (citing *Brown*, 903 F.2d at 278). Correct Care Defendants, as members of the Hepatitis C Treatment Committee, may consider costs when approving DAADs medication treatment, so long as the treatment is consistent with its sound medical judgment. *See Winslow*, 406 F. App'x at 672, 675. Thus, even assuming, *arguendo,* that Davis created a triable issue regarding the objective prong of his deliberate indifference claim, Davis has not created a genuine issue of material fact regarding the subjective prong of his deliberate indifference claim against Correct Care Defendants. *See Fantone*, 528 F. App'x at 125-26; 126 n. 3; *Gershen*, 466 F. App'x at 87.

Even assuming that the record contained evidence that the treatment was inadequate, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference" when there is no evidence that said treatment violated proper standards of care. *Pearson*, 850 F. 3d at 535 (*citing O'Carroll*, 991 F.2d at 69 n. 13; *Brown*, 903 F.2d at 278); *see also Serrano v. Folino*, 339 F. App'x 254, 256-57 (3rd Cir. 2009) (summary judgment warranted when record "indicates that [prisoner-plaintiff] received frequent medical attention, including an MRI, a recommendation that he receive physical therapy, and an assessment by a team of physicians, including an orthopedic specialist" and prisoner-plaintiff's claim that "knee surgery was improperly withheld rests entirely on his allegation that [defendant physician] promised to recommend knee surgery and did not do so"). Further, although there may be a question of fact regarding the motives of the DOC medical providers responsible for delaying treatment when delay eliminates the possibility of that treatment's effectiveness, there is no dispute that there is no detectable Hepatitis C virus in Davis's lab work and there is no evidence that Davis's other medical conditions are related to his Hepatitis C infection. *Cf. O'Carroll*, 991

F.2d at 68-69 (finding question of fact regarding prison physician's intent precluded summary judgment on deliberate indifference claim when inmate suffered stroke pre-incarceration, repeatedly notified prison authorities of his deteriorating condition, prison physician sent plaintiff to a neurologist who "specifically recommended physical therapy," and it was "undisputed that physical therapy must take place within approximately eighteen months of a stroke to be effective, [and so] time was of the essence"). As such, even though Davis exhausted his administrative remedies against Correct Care Defendants, the record is devoid of any disputed material fact precluding summary judgment on the deliberate indifference claim against Correct Care Defendants. *See McCloskey*, 803 F. App'x at 581-82 (granting summary judgment where medical director "continually monitored [plaintiff] from the day of his injury through his discharge from surgery, and 'at every turn' to ensure his expeditious care."); *Cowher v. Pike Cty. Corr. Facility*. No. 3:16-CV-02259, 2019 WL 3302415, at *15 (M.D. Pa. July 23, 2019) (granting summary judgment because plaintiff failed to create a dispute of material fact where record evidence showed DOC medical personnel used various treatments to address plaintiff's medical needs).

Viewing the evidentiary record, and the reasonable inferences therefrom, in the light most favorable to Davis, the non-moving party, Correct Care Defendants are entitled to summary judgment with respect to Davis's Eighth Amendment deliberate indifference claims at this time. Accordingly, the Correct Care Defendants' motion for summary judgment on Davis's Eighth Amendment deliberate indifference claim for failure to treat Davis's Hepatitis C is granted. (Doc. 184).

C.  POLICY, PRACTICE, OR CUSTOM OF DELIBERATE INDIFFERENCE OF CCS

Correct Care Defendants seek to dismiss Davis's *Monell* claims. (Doc. 188, at 16-17). Correct Care Defendants argue that CCS cannot legally be held liable because Davis failed to plead a policy, practice, or custom of deliberate indifference authorized by a final policymaker of CCS. (Doc. 188, at 17); *Monell*, 436 U.S. at 690. The Court agrees and concludes that Davis fails to allege facts sufficient to state a plausible *Monell* claim against CCS.

According to Davis, CCS is a private corporation that has been contracted to provide medical care to inmates at SCI-Davis and a member of the Hepatitis C Treatment Committee that approve and deny treatment to inmates. (Doc. 112, at 3). A private corporation can be held liable for constitutional violations only if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs. *See Monell*, 436 U.S. at 690 (subjecting municipalities to liability for policies or customs that cause constitutional deprivations); *Natale*, 318 F.3d at 584 (applying *Monell* to a private company providing medical services to inmates); *see also Weigher v. Prison Health Servs.*, 402 F. App'x 668, 669-70 (3d Cir. 2010) (nonprecedential) (noting that a private corporation providing medical service at a state correctional facility cannot be held liable under a theory of respondeat superior in a § 1983 suit). Thus, to prevail on his claims against CCS, Davis must show that there "there was a relevant [CCS] policy or custom, and that the policy caused the constitutional violation" for which he seeks relief. *See Natale*, 318 F.3d at 583-84; *see also Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016) (prison medical service providers were not responsible for any deprivation of prisoner's medical care, and thus providers were not deliberately indifferent to prisoner's serious medical needs under the Eighth Amendment, where failure to transport prisoner to proscribed therapy was attributed to understaffing in the prison, which was controlled by

DOC, and there was no evidence that any shortage of prisoner's pain medication was a common or systematic problem).

Davis asserts that CCS has "a policy, practice or custom of ignoring the serious medical needs of Pennsylvania prisoners to save funds." (Doc. 112, at 10-11). However, Davis has not attempted to identify any policy, practice, or custom that allegedly led to the violation of his constitutional rights. Moreover, regardless of any policy, practice, or custom it may have adopted, a medical services contractor, such as CCS, cannot be held vicariously liable under *Monell* unless one of the individual defendants "is primarily liable under section 1983 itself." *Williams*, 891 F.2d at 467; *see also City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (municipal liability requires an underlying constitutional violation). As discussed above, Davis has not created a genuine issue of material fact regarding his deliberate indifference claim against Correct Care Defendants. *See Cowher*, 2019 WL 3302415, at *15-16 (granting summary judgment because plaintiff failed to allege medical services contractor-defendants were primarily liable under section 1983).

Accordingly, Davis cannot maintain a *Monell* claim against CCS, and summary judgment is entered in Correct Care Defendants' favor. (Doc. 184).

IV.   **CONCLUSION**

Based on the foregoing, Correct Care Defendants' motion for summary judgment is **GRANTED**. (Doc. 184).

An appropriate Order follows.

BY THE COURT:

Dated: December 23, 2021                 *s/ Karoline Mehalchick*
                                                          **KAROLINE MEHALCHICK**

**Chief United States Magistrate Judge**